FILED

2014 Jun-03  AM 10:04
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT FOR
## THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **DORIAN D. MARTIN,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CASE NO.:   CV-12-BE-4062-S** |
| | ) | |
| **GESTAMP ALABAMA, LLC,** | ) | |
| | ) | |
| **Defendant** | ) | |

## MEMORANDUM OPINION

This employment discrimination matter asserting race discrimination and retaliation is before the court on "Defendant's Motion for Summary Judgment" (doc. 31), which has received thorough briefing (*see* docs. 32, 36, & 38), and Defendant's "Motion to Strike" (doc. 43).  For the reasons stated in this Memorandum Opinion, the court FINDS that the motion to strike is due to be DENIED; that the motion for summary judgment is due to be GRANTED as to the disparate treatment claim based on race; and that the claim for retaliation based on race is due to be DISMISSED as abandoned.

### I.  PROCEDURAL HISTORY

Plaintiff's Second Amended Complaint (doc. 20) contains the following claims: (1) First Cause of Action – race discrimination brought pursuant to Title VII and § 1981; (2) Second Cause of Action – hostile work environment on the basis of race brought pursuant to Title VII and § 1981; (3) Third Cause of Action – retaliation on the basis of race brought pursuant to Title VII and § 1981; (4) Fourth Cause of Action – sex discrimination brought pursuant to Title VII;

(5) Fifth Cause of Action – nonpayment of overtime in violation of the FLSA; and (6) Sixth

Cause of Action – retaliation/discrimination in violation of FLSA.  On August 29, 2013, the

Plaintiff filed "Plaintiff's Stipulation for Partial Dismissal of Claims," (doc. 28), stipulating that

the following claims be dismissed: hostile work environment on the basis of race; sex

discrimination; nonpayment of overtime in violation of the FLSA; and retaliation/discrimination

in violation of FLSA.  Based on that stipulation, the court dismissed those causes of action with

prejudice.  (Doc. 30).  Accordingly, the only claims that remain to be addressed at summary

judgment are as follows: the First Cause of Action – race discrimination brought pursuant to

Title VII and § 1981; and the Third Cause of Action – retaliation on the basis of race brought

pursuant to Title VII and § 1981.

## II.  MOTION TO STRIKE

Defendant Gestamp filed an eighteen page "Motion to Strike" complete with 29

footnotes. (Doc. 43).  Many of the objections forming the basis of the motion would more

properly be stated in the section of the reply brief responding to Plaintiff's facts, and the court

has already advised the Defendant of its concern that filing a separate, lengthy document styled

as a notice of objections or a motion to strike should not be an end-run around the page

limitations of the reply brief.  (*See* doc. 42).   In any event, this court may consider the substance

of the motion to strike without actually striking the evidence that the Plaintiff submitted.  "Only

evidence that is admissible on its face or that can be reduced to admissible form and that

complies with Federal Rule of Civil Procedure 56(e) will be considered in deciding a motion for

summary judgment." *Johnson v. Gestamp Alabama, LLC,* 946 F. Supp. 2d 1180, 1192 (N.D.

Ala. 2013) (quoting *Stuckey v. Alabama Bd. of Pardons & Paroles,* 2012 WL 3670644, *1 n.2

(M.D. Ala. Aug. 27, 2012)).  Accordingly, the court will DENY the motion to strike, but will

consider the substance of the motion to strike in deciding the motion for summary judgment.

### III.  FACTS

The court obtained the facts below from the statement of facts set out in the parties'

briefs, and the court's examination of the evidentiary record.  The court has resolved all

reasonable doubts regarding the facts in favor of the nonmoving party.  *See Info. Sys. & Networks*

*Corp. v. City of Atlanta,* 281 F.3d 1220, 1224 (11th Cir. 2002).  Accordingly, the statement of

facts in this opinion reflects the facts for summary judgment purposes only.

From June 25, 2005 until his discharge in April of 2011, Plaintiff Dorian Martin, an

African American male, was an employee of Defendant, Gestamp Alabama, LLC.  Defendant is a

stamping and welding facility that provides parts to automotive manufacturers such as Mercedes-

Benz. Although Martin worked various shifts in various departments during his tenure with

Gestamp, at the time of the events made the basis of this suit, Martin was working on the second

shift with the Ultrasound Technology Group ("UT Group").  In that position on that shift, Curtis

Johnson, an African American, was Martin's Team Leader, and Martin reported to the following

members of management: Maintenance Manager Mike Crawford, a Caucasian, from

approximately January 2008 until November 2010, and Quality Manager John Nelson, a

Caucasian, from November 2010 until Martin's discharge the following April.   From early 2008

through Martin's termination, Marva Morgan, an African American female, held the position of

Gestamp's Human Resources Manager, and Jamie Mitchell, a Caucasian, was the Plant Director.

Investigation of Alleged Misconduct and Termination

In early 2011,  an African-American Team Leader advised Morgan that she was having difficulty locating Martin's UT Group during work hours, and Morgan relayed this information to Nelson.  The complaint was directed at Team Lead Johnson and the UT group in general, not at Martin specifically, and Nelson began investigating the problem in January of 2011.  As part of this investigation, Nelson arranged for Quality Engineer Kenny Green[1], who worked on the second shift, to monitor the second shift UT Group for compliance with Gestamp policies and procedures.

On February 3, 2011 Nelson forwarded to Morgan emails from Green, stating that Green had observed Martin's extended absence from his workstation on two occasions: an absence of approximately one hour and fifteen minutes from his workstation on January 27, 2011; and an absence of approximately one hour and fifteen minutes on February 1, 2011, with a total absence for the day of over one hour and a half.  Specifically, on January 27, 2011, Green had documented that Martin was absent from his workstation at 8:45 PM, 9:30 PM and 9:45 PM, and Green observed him walking in the door from the parking lot at 10:00 PM.  Green similarly documented Martin's absence on February 1, noting Martin was observed walking out the door at 8:15 PM and he was observed returning at 9:30 PM as well as noting he was not at his work station during intervals between those two times.

After receiving Nelson's February 3 email, Morgan followed up with the second shift's senior Group Leader, Darrick Stallworth, an African American, asking him to observe Martin to

---

[1] The briefs' statements of facts do not reflect Green's race, although the argument of the reply brief identifies him as a Caucasian.

4

determine whether Martin's extended absences could be explained by his working away from his usual workstation, or if his absence otherwise complied with company policy.   On February 9, 2011, Stallworth sent an email to Morgan advising her that on the prior day (February 8, 2011), Stallworth left Gestamp property at 9:30 PM and had observed Martin sitting in his car, and then, after 10:30 PM, Stallworth had observed Martin still sitting in his car.  Stallworth also documented that Martin had entered the Gestamp building sometime after 10:30 PM and had spoken to him upon re-entry, and that Group Leader Armen Weinrick[2] had walked up and joined the conversation.  As the senior Group Leader on Martin's shift, Stallworth would have been the person on site to authorize Martin's absence, but Stallworth had not.

Morgan also received an email from Weinrick, dated February 9, 2011, confirming some of Stallworth's observations.  In that email,  Weinrick confirmed the following facts:  he received a call from Stallworth advising that Martin was outside the plant, sitting in his car, and asking Weinrick to observe when Martin returned to work; from 9:30 PM to 10:10 PM, Weinrick sat on the patio where he could observe people returning to work from the parking lot and did not see Martin return; at 10:30 PM, Weinrick observed someone sitting in Martin's car, and, in an effort to verify that the person in the car was Martin, Weinrick went by the UT Lab and confirmed that Martin was not there. Weinrick also confirmed that about 10:45 PM, he saw Martin talking to Stallworth inside the plant building, near the entrance from the parking lot.

Having confirmed that Martin had been absent more than an hour on February 8 without Stallworth's authorization, Morgan next checked with Quality Manager Nelson and Plant Manager Mitchell and confirmed that they had not authorized Martin's absence on that date,

---

[2]   The briefs' statements of facts do not reflect Weinrick's race.

either.  By February 10, 2011, Morgan  concluded that Martin had violated Gestamp's "Zero

Tolerance" rule prohibiting leaving the plant during work hours without permission.  Because of

staffing considerations, she delayed discipline for this violation until Gestamp could find workers

to cover the second shift.  She transferred Caucasian Kristopher Thompson from first to second

shift in March of 2011, and two other associates received UT Group skills training so that the

second shift could function smoothly after Martin's termination.

On March 28, 2011, Morgan suspended Martin consistent with Gestamp's procedure

calling for a period of suspension immediately prior to termination to ensure that paperwork was

in order.  When Morgan called Martin into her office with management members to advise him

of the suspension, Martin testified that John Nelson told him that he was being suspended

because of "[b]reak, extended breaks and lunches and speculation of sleeping in a car.  And I was

like – His exact words were: Somebody seen you sleeping in a car."[3]  (Doc. 33-2, at 31 p. 121).

Martin gave Morgan a general denial of misconduct, stating "You know this is not accurate

because you know me."  (Doc. 33-2, at 31 p. 123).  The briefs do not point the court to any

specific explanation or information Martin gave Morgan about who gave him permission to go

outside the plant for an extended break/lunch or the circumstances surrounding any such

permission.

During the suspension, Morgan re-verified the facts and reviewed documentation,

including matching time cards with the times he was observed away from his workstation.  She

noted that his time records from January and February of 2011 showed that Martin was still

---

[3] As confirmation that the initial reason given was not limited to sleeping in his car, Martin testified at
another point shortly thereafter in his deposition, "See, originally they told me it was extended lunch and breaks.
And the primary was that I got – somebody caught me sleeping in the car."  (Doc. 33-2, at 33, p. 129).

clocked in at the time he was observed to be absent for an excessive time away from his

workstation; in other words, Martin was still "on the clock" and getting paid when he was away

from his workstation.  Because the documentation re-confirmed her conclusion that Martin had

violated Zero Tolerance offenses, Morgan made the decision to terminate Martin effective April

1, 2011 "because he left Gestamp's facility during work hours without permission and was

absent from his workstation without permission for excessive periods during the workday in

violation of Gestamp's 'Zero Tolerance' policy."  (Doc. 33-1, at 13).

 Morgan made the decision and terminated Team Leader Johnson for the same offense at

approximately the same time as Martin's termination.  (Doc. 37, Ex. 1, pp. 73).

The "Coaching and Counseling Form," dated April 1, 2011, states in part:

> It was concluded that Dorian Martin did violate the standards of conduct by exceeding
> the authorized length of break periods, leaving the plant during work hours without
> permission, and excessive unauthorized absence from the workstation during the
> workday.  Dorian, because you exceeded the authorized 30 minutes for lunch on several
> occasions, you were paid for time not worked.  As an Associate, it is your responsibility
> to return from lunch on time.  Leaving the plant during work hours without permission
> and excessive unauthorized absence from your workstation during the workday is a
> violation of the **Zero "0" Tolerance Approach Policy** which is subject to disciplinary
> action up to and including immediate termination.  Because you violated this policy you
> are being terminated effective April 1, 2011.

Martin signed the document with a date of April 7, 2011, writing below his signature: "I am not

agreeing with the charge/violations," but he did not specify the basis of his disagreement.   (Doc.

33-4, at 60).

Although Martin generally disputes in his brief and deposition testimony that he ever left

Gestamp's facility during work hours without permission for excessive periods, elsewhere in his

deposition testimony, he stated that he did not have any specific recollection of those three dates

and did not know of any reason he needed to be outside the plant building for over an hour on those dates other than being on break.  (Doc. 33-2, at 29 pp. 111-12).  Morgan states in her affidavit that "[a]t no time did Mr. Martin deny being away from his workstation for multiple times of more than an hour each time nor deny reports of him being outside the building for these extended periods, and at no time did he offer any explanation for these extended absences." (Doc. 33-1, at 12).

Martin testified that, at the time of Martin's termination, no Caucasians worked on the second shift, and no African Americans worked on the first shift, although based on Morgan's testimony, she had just transferred Kristopher Thompson to the second shift.

EEOC Charge

On April 4, 2011, Martin filed an EEOC Charge.  He checked the boxes for discrimination based on race and sex but did not check retaliation.  He relates the following discrimination: (1) being given the "run around" when he attempted to return to work on the day shift, which, at the time, was staffed with Caucasians only while the night shift was staffed with African Americans only; (2) being threatened by assistant plant director with losing his job when Martin wanted to file a complaint about the bogus charges that a Caucasian Group Leader asserted against him for supposedly harassing a white female employee; (4) being suspended and terminated, although he had never received previous disciplinary action, for taking extended breaks, taking excessive lunch breaks, not clocking out for lunch and sleeping in his car on lunch breaks when white or female employees who committed company policy violations were not suspended or terminated.  The Charge lists the dates of discrimination as between 2-1-11 and 4-1-11.

<u>Gestamp Policies and Procedures</u>

At Gestamp, employees are known as "associates."  The Associate Handbook, which Martin received, sets out Gestamp's company policies and procedures, and the relevant ones are discussed below.

*Breaks/Lunch*

The Associate Handbook allows time off during each shift for a 20-minute paid break; an additional 10-minute paid break for work days exceeding 9 hours; and an unpaid 30-minute meal period.  Thus, for a work day of 9 hours or less, the maximum time off work during each shift would be 50 minutes and for a work day of more than 9 hours, the maximum time off work during each shift would be 60 minutes.

*"Zero Tolerance" Violations*

In her affidavit, Morgan explained that Gestamp deems certain violations to be "Zero Tolerance" because of the severity of the violation to the continuous staffing of the production process.  Pages 37-38 of the Associate Handbook contain the following provision:

> The following infractions will be subject to Gestamp Alabama's **<u>Zero "0" Tolerance</u>** approach Policy which will be subject to disciplinary action up to, and including immediate termination:
> ***
> Sleeping during work hours without permission
> ***
> Leaving the plant during work hours without permission.
> ***
> Violation of Gestamp Alabama's Sexual or Other Forms of Impermissible Harassment Policy.  Unlawful discrimination and/or illegal harassment
>
> Insulting Language or Inappropriate Behavior
> ***
> Threatening, intimidating or coercing with other associates
> ***

9

Excessive unauthorized absence from workstation during the workday

(Doc. 33-1, at 57-58, pp. 37-38).  Morgan testified that "[d]iscrimination in any form is a

zero tolerance infraction."  (Doc. 37, Ex. 1, pp. 61).

*Other Provisions of Associate Handbook*

The "Standards of Conduct" provision of the Gestamp Associate Handbook, which is a

separate section than the "Zero Tolerance" section, provides in relevant part as follows:

STANDARDS OF CONDUCT

The following infractions or any combination herein will be subject to the progressive
corrective [discipine] action:

Wasting time or loitering on any Gestamp Alabama property during working hours

Horseplay, distracting attention of others or causing a disturbance
***
Unacceptable performance and/or inappropriate conduct/behavior
***
Repeated failure to swipe (punch) in or out, including leaving property during unpaid
breaks

***
Excessive tardiness and/or absenteeism

Exceeding the authorized length of break periods

(Doc. 33-1, at 56-57).

Comparator

*Workers Exceeding Combined Breaks/Lunch*

In his deposition, Martin testified that, at the time of his termination, everyone on the day

shift was Caucasian and everyone on the night shift was African American, so comparators at the

time of termination could only come from the day shift.  However, earlier in his tenure at

Gestamp,  Martin had worked on the day shift, and he testified that everyone on day shift had combined lunch periods and breaks,[4] and had exceeded the time allotted for those combined periods on more than three occasions without permission but had not been disciplined.  He named the following workers who had exceeded the combined periods without permission: Kevin Childers (Team Leader- first shift), Greg Lucas (UT Tech - first and second shift), David Thompson (UT Tech - first shift), Herb Mayo (UT Tech - first and second shift), Darrell Savage (UT Tech - first shift), "Randy" (UT Tech - first shift).   All these workers were presumably Caucasian.  At another point in the deposition, Martin testified that, to his knowledge, no one left the plant *to get breakfast for the group* without obtaining the permission of Team Leaders Stuart Norwood or Childers.   Further, Martin testified that Childers and David and Kris Thompson, all of whom are Caucasian, exceeded breaks regularly because they were smokers, and they also went outside to smoke at times that were not scheduled break or lunch times, but were not disciplined.

Martin acknowledged that he never reported this misconduct to Morgan and does not know if anyone reported to Morgan that any employees exceeded their breaks.  Morgan stated in her affidavit that "[n]o one reported first shift employees Kevin Childers ... David Thompson ... and Greg Lucas, ... nor any retained employee, for what I considered a Zero Tolerance violation–let alone what Dorian Martin did."  (Doc. 33-1, at 14 ¶ 15).

---

[4] A dispute exists about whether Gestamp allowed associates to combine lunch and breaks so that they could have one long 50 minute period off work on regular work days or a 60 minute period for work days exceeding 9 hours. Martin and other associates provide evidence that they combined lunch and breaks routinely with management's knowledge. However, on the three occasions of extended absence from work forming the basis of Martin's termination, his period off work *exceeded* 60 minutes.

*Other Conduct Potentially Falling under Zero Tolerance*

In 2008, according to Martin, a Caucasian ultrasonic tester named Randy pulled a knife

on Martin, and called Martin and his coworkers "niggers." Martin reported the knife incident to

Stuart Norwood, his Group Leader at the time.  No evidence exists that anyone relayed the knife

incident to Morgan, and Morgan denied knowing about it.

However, Martin also claims that he complained directly to Morgan about Randy's

calling the African American workers "niggers."  Carlos Simon, an African American, confirms

in his affidavit that Martin, Toyer, and he reported to Morgan the ultrasonic tester's racial slur.

Morgan testified that she was unfamiliar with any Gestamp employee named Randy but

acknowledged that she received a complaint from Toyer that a Caucasian associate named

Ronald Redmond had made inappropriate race-related comments about him, and she further

acknowledges that Martin may have accompanied Toyer in presenting the complaint, although

she does not specifically recall his involvement.  The Gestamp "Coaching and Counseling Form"

for Ronald Redmond is dated May 21, 2008 and sets May 20, 2008 as the date  for the associate

complaint about Redmond's inappropriate race-related comments.  According to Simon's

affidavit, a few days after the complaint, Morgan called Martin, Toyer, and Simon into her office

and told them that they needed to stop complaining about the tester and try to avoid him,

indicating that if they did not do so, their jobs would be in danger.

 Morgan investigated that complaint, and she explained that she had concluded that

Redmond did not use racial slurs like "nigger," but that he did use "racially inappropriate and

unprofessional speech."  Accordingly, she characterized the misconduct as "inappropriate

conduct/behavior" warranting progressive corrective action but not "insulting language or

inappropriate behavior" falling within the "Zero 'O' Tolerance" Approach Policy.  The

"Coaching and Counseling Form" dated May 21, 2008 and signed by Ronald Redmond states:

> On Tuesday, May 20, an associate come to HR to file a formal complaint on
> Ronald Redmond for inappropriate race related comments made about the
> associate.  HR investigated the complaint and found that Ronald Redmond did
> in fact make racial related comments and has in the past made comments that
> were offensive in nature pertaining to race.  It was also revealed in the
> investigation that Ronald Redmond conducted himself unprofessionally in the
> work place by consistently getting upset with associates using profanity and
> even going as far as to say that he knew where certain employees lived.  This
> conduct is unacceptable and will not be tolerated in the work place under any
> circumstances.  This is a violation of the standards or conduct "inappropriate
> conduct/behavior."

As the form reflects, Morgan testified that Redmond was suspended but was not terminated.

Rather, an "x" mark is next to "Decision Making Leave/Last Chance Agreement."  (Doc. 33-1, at

97).

## IV.  ANALYSIS

Martin's two claims that remain to be addressed at summary judgment are for race

discrimination and for retaliation based on race, both brought pursuant to Title VII and § 1981.

## A.  Race Discrimination

Martin asserts a claim of race discrimination, alleging that Gestamp discriminated against

him in discharging him for his violation of the "zero tolerance" policy when it did not discharge

similarly-situated Caucasian employees.

Both Martin and Gestamp analyze this claim as one of circumstantial evidence under the

*McDonnell Douglas* framework.  *See McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802

(1973).  Because discrimination based on race asserted under both § 1981 and Title VII have the

same requirements of proof and the same analytical framework, *Standard v. A.B.E.L. Servs., Inc.,*

161 F.3d 1318, 1330 (11th Cir. 1998), the court will address them together.  To establish a *prima facie* case of disparate treatment in a race discrimination case under that framework, a plaintiff must prove the following elements: that "(1) [he] is a member of a protected class; (2) [he] was subjected to an adverse employment action; (3) [his] employer treated similarly situated employees outside of [his] protected class more favorably than [he] was treated; and (4) [he] was qualified to do the job."  *Burke-Fowler v. Orange Cnty., Fla.,* 447 F.3d 1319, 1323 (11th Cir. 2006).  If the plaintiff establishes his *prima facie* case, the employer must articulate a legitimate, non-discriminatory reason for its employment action, and, if it does so, then the plaintiff must prove that its reason was pretext for race discrimination.  *Id.*

Gestamp challenges the third element, asserting that Martin cannot show that the same decisionmaker treated him more harshly than an appropriate comparator.  The Eleventh Circuit has explained that, in addressing this element,

> we evaluate "whether the employees are involved in or accused of the same or similar conduct and are disciplined in different ways."  When making that determination, "[w]e require that the quantity and quality of the comparator's misconduct be nearly identical to prevent courts from second-guessing employers' reasonable decisions and confusing apples with oranges."

*Id.* (quoting *Maniccia v. Brown,* 171 F.3d 1364, 1368 (11th Cir. 1999) (internal citations omitted)); *see also Stone & Webster Const., Inc., v. U.S. Dept. of Labor,* 684 F.3d 1127, 1135 (11th Cir. 2012) (resolving a conflict in favor of *Maniccia's* "nearly identical" standard and against the language in *Anderson v. WBMG-42,* 253 F.3d 561, 565 (11th Cir. 2001) stating that the plaintiff need not prove that the comparator's conduct was the same or nearly identical).

14

The Eleventh Circuit has also explained that a plaintiff must show that he and the identified comparator(s) are "similarly situated in all relevant respects." *Holifield v. Reno,* 115 F.3d 1555, 1562 (11th Cir. 1997). "The most important factors in the disciplinary context are the nature of the offenses committed and the nature of the punishments imposed." *Stone & Webster,* 684 F.3d at 1135 (quoting *Maniccia,* 171 F.3d at 1368). Accordingly, the court must determine whether Martin has presented a Caucasian comparator whose alleged misconduct was similar in all relevant respects, and where the quality and quantity of the misconduct was nearly identical, and yet the comparator was treated more leniently that Martin.

*Comparators: First Shift Caucasian Workers who Exceeded Combined Lunch & Break without Permission*

In his deposition testimony, Martin stated that while he was working on day shift, he observed Kevin Childers, David Thompson, Herb Mayo, Darrell Savage, Randy somebody, and Greg Lucas—in essence, the whole shift[5]—exceed their combined lunch and breaks more than three occasions without permission. Thus, he presents the Caucasian first shift workers as comparators. Gestamp argues that Martin's assertion is not supported by evidence because he acknowledges that he did not use a watch to time their absence. However, the court finds that he has testified to his personal knowledge as a co-worker observer on first shift at that time, and the failure to calculate time by his watch does not render his testimony inadmissible. A jury may certainly consider the fact that he did not time the absences as a consideration about the reliability of the testimony. Gestamp also objects to a lack of foundation, but Martin's presence

---

[5] In Martin's Statement of Facts, he stated that "Everyone on day shift was Caucasian" (doc. 36, at 4 ¶ 16 & 9), and in his brief, he specifically identifies Kevin Childers, David Thompson, Greg Lucas as Caucasian (doc. 36, at 9). To the extent "Randy" was Ron Redmond, he is identified as Caucasian (doc. 36, at 10 & 13).

as a co-worker observer on first shift provides sufficient foundation for these purposes.  He could also testify to the custom and practice of combining lunch and breaks, and of exceeding without consequence the combined periods.

Further, Gestamp argues that Martin's testimony, taken as a whole, is that first shift workers had permission for their absences, or, to the extent that he attempts to testify that they did not, that testimony conflicts with his other testimony that they did indeed have permission from Group Leaders.   Martin testified that Norwood and/or Childers gave first shift workers permission to leave the plant *for the purpose of purchasing breakfast* for shift members, and that no one left the plant *to purchase breakfast* without permission.  That testimony does not necessarily contradict his other testimony that first shift workers exceeded their combined *lunch* period and break without permission.  Logically, workers could obtain permission to leave the premises to purchase breakfast for the group, but fail to obtain permission to take a combined personal lunch period and break that exceeded their allotted time; one statement does not necessarily exclude the other.  Accordingly, for the purposes of summary judgment, the court accepts Martin's testimony that these Caucasian first shift workers committed the same offense as he did.

However, evidence that first shift workers committed the same offense as Martin is not enough: Martin must also establish that the decisionmaker had *notice* of their committing the same offense.  Martin acknowledges that he never notified Morgan, the decisionmaker who made the decision to terminate him, about the first shift members exceeding their combined lunch and break, and further acknowledges that he did not know if anyone else reported this conduct to Morgan.  (Doc. 33-2, at 37, pp. 141-42)  Martin presented no evidence that Morgan received

16

notice of this particular offense, and Morgan specifically denied that she received notice that the Caucasian workers committed that offense.  Rather, she testified that she terminated every worker who committed this offense about which she received notice.

Evidence that the decisionmaker—here, Morgan—had notice of these offenses by the proffered comparators is crucial to Martin's *prima facie* case.  *See Jones v. Gerwens,* 874 F.2d 1534, 1541-42 (11th Cir. 1989) (stating that the motives of the decisionmakers who disciplined the plaintiff were at issue and the failure to "adduce evidence of knowledge on the part of" decisionmakers regarding comparators' misconduct meant that the plaintiff had "failed to make out a prima facie case of disparate treatment").  Martin's failure to provide such evidence means his *prima facie* case fails as to those comparators.

*Comparators: Workers who Exceeded Breaks*

Martin provides evidence that numerous associates exceeded their breaks or left their work stations to smoke outside of breaks.  His statement of facts presented to the court does not clarify how many minutes the other associates exceeded their breaks and whether they took their smoke breaks off campus or in some designated on-campus smoking area.  In her affidavit, Morgan explained that she considered exceeding breaks as different from the offense for which she terminated Martin—exceeding combined lunch and break periods without permission on three separate occasions.  Further, she characterized the offense of exceeding breaks as falling outside zero tolerance offenses, and indeed, "exceeding the authorized length of break periods" is listed under a different page in the associates' handbook than the Zero Tolerance offenses.  This court finds that the other workers who merely exceeded breaks or smoked outside of breaks did not commit offenses that were similar in all relevant respects to the offenses for which Martin

was terminated, and that the quality and quantity of the misconduct were not nearly identical; therefore, those other workers are not appropriate comparators.

As an alternative ruling, to the extent, if any, that the misconduct of exceeding breaks or smoking outside of breaks is similar in all relevant respects to the offenses for which Martin was terminated, the court finds that Martin presented no evidence that Morgan received notice that the Caucasian presented as comparators committed this misconduct, and Morgan specifically denied that she received notice that they committed a zero tolerance offense. Martin's failure to receive notice of the alleged comparator's offenses means that Martin fails to establish his *prima facie* case as to those alleged comparators.

*Comparator: Ronald Redmond a/k/a "Randy"*

The final comparator proffered was a Caucasian ultrasonic tester whom Martin identified as "Randy" and whom Gestamp identified as Ronald Redmond. Martin claimed that this associate pulled a knife on him and called Martin and African American co-workers "niggers." Gestamp asserts that this conduct is not similar in all relevant respects to the offense for which Martin was terminated, and that Morgan only had notice of the complaint of the racial slur, of which she found he was not guilty, and of Redmond's use of other inappropriate language, of which she found he was guilty.

Martin responds that the ultrasonic tester's conduct fell within the "Zero Tolerance" list, claiming that (1) he violated the harassment and discrimination policy by calling co-workers "niggers" and otherwise using "racial related comments" that were insulting and inappropriate; (2) he threatened co-workers and, thus, violated the provision about "threatening, intimidating or coercing with other associates"; and (3) his use of profanity and offensive comments in the past

18

fell within the Zero Tolerance category of  "insulting language or inappropriate behavior."
Martin claims that Redmond/Randy's violation of three Zero Tolerance policies means that his
conduct was similar to Martin's or constituted even more serious violations, and those violations
prove that Morgan and Gestamp treated Caucasian violators of the "Zero Tolerance" offenses
differently than they treated him.

The court finds that Redmond's offenses about which Morgan had notice and found to
have occurred—the use of racial language (but not the insulting word "nigger") and using
profanity and verbal threats to co-workers—were not similar in all relevant respects to those
offenses Martin committed, and the quality and quantity of the misconduct were not nearly
identical.  Therefore, Redmond is not an appropriate comparator to Martin, and Martin fails to
meet his *prima facie* case using Redmond as a comparator.

Alternatively, to the extent, if any, that committing any "Zero Tolerance" offense
represents a similar offense to the offense committed by Martin, the court notes that Morgan
specifically found in May of 2008 that Redmond's conduct did *not* fall within the "Zero
Tolerance" list; she recorded that finding in Redmond's "Coaching and Counseling Form."
Martin disagrees with Morgan's characterization of Redmond's conduct as falling outside "Zero
Tolerance" offenses.  However, Morgan made this decision *years before* the termination of
Martin, and thus, the decision that Redmond's offense fell outside "Zero Tolerance" could *not*
have been an attempt to distinguish it from the decision for Martin by placing the offenses in
different categories.

As Martin has failed to show any appropriate comparator, he has failed to meet his
burden of demonstrating a *prima facie* case of disparate treatment based on race regarding his

termination.  The court recognizes that Martin believed his termination to be unfair and discriminatory because of his lack of prior discipline and because he saw, but did not report, with one exception, others committing violations of company policies.  However, Martin's termination decision was made by an African American Human Resources Manager based in part on an African American senior Group Leader's carefully documented record of Martin's violations.   Martin has not provided an appropriate Caucasian comparator who committed a similar violation that was reported to the decisionmaker.  Because Martin does not provide an appropriate comparator, he, in essence, is asking the court to act as a "super-personnel department" and to re-examine the employer's business judgments and second-guess whether they were fair and appropriate, a role that the Eleventh Circuit has found to be inappropriate. *See Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1092 (11th Cir. 2004) (quoting *Lee v. GTE Fla, Inc.*, 226 F.3d 1249, 1254 (11th Cir. 2001)).   Rather, this court's role is to determine whether the termination, unfair or not, was *discriminatory,* and a plaintiff's burden is to provide an appropriate comparator who is similar in all relevant aspects.  Here, Martin has not met his burden.  Consequently, as to the first cause of action stated in the Amended Complaint, Gestamp's motion for summary judgment is due to be GRANTED; summary judgment is due to be entered in favor of Gestamp and against Martin on the disparate treatment claim brought pursuant to both Title VII and § 1981.

As an alternative ruling, the court finds that even if Martin had met his *prima facie* case, Gestamp has articulated a legitimate, non-discriminatory reason for his discharge—commission of a Zero Tolerance offense by exceeding his combined lunch and breaks on more than three occasions without permission—and Martin has not met his burden to provide evidence that the

20

reason was pretext for discrimination.  *See Burke-Fowler,* 447 F.3d at1323.   The Eleventh

Circuit has explained that in asserting pretext, a plaintiff "must confront the employer's

seemingly legitimate reason for not promoting [him] 'head on and rebut it.' *Kidd v. Mando Am.*

*Corp.,* 731 F.3d 1196, 1206 (11th Cir. 2013) (quoting *Chapman v. AI Transp.,* 229 F.3d 1012,

1030 (11th Cir. 2000) (en banc)).   To do so, he must "cast sufficient doubt on the defendant's

proffered ... reasons to permit a reasonable factfinder to conclude that the employer's proffered

'legitimate reasons were not what actually motivated its conduct.'" *Combs v. Plantation*

*Patterns,* 106 F.3d 1519, 1538 (11th Cir. 1997) (quoting *Cooper-Houston v. Southern Ry. Co.,*

37 F.3d 603, 605 (11th Cir. 1994)).   He can do that by demonstrating "'such weaknesses,

implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered

legitimate reasons for its action that a reasonable factfinder could find them unworthy of

credence.'"   *Combs,* 106 F.3d at 1538 (quoting *Sheridan v. E.I. DuPont de Nemours & Co.,* 100

F.3d 1061, 1072 (3rd. Cir. 1996)).   However, a plaintiff "'cannot succeed by simply quarreling

with the wisdom of that reason ....'" *Kidd,* 731 F.3d at 1206 (quoting *Chapman v. AI Tranport,*

229 F.3d 1012, 1030 (11th Cir. 2000)).

   Martin attempts to establish pretext three ways: (1) by arguing that Caucasian Ron

Redmond committed violations of greater severity but was not terminated; (2) by arguing that

Morgan's explanation shifted regarding when and how she made the termination decision; and

(3) by arguing that Gestamp changed the offense for which Martin was disciplined. These

arguments are unavailing.  As to the first argument, the court notes that Morgan's discipline

decision regarding Redmond occurred almost three years before the incident with Martin and,

given the differences in the *time* as well as the *nature* of the offenses causing discipline, that

disciplinary action involving Redmond has not cast sufficient doubt on the defendant's proffered reason to permit a reasonable factfinder to conclude that the employer's action was discriminatory.  Even if Morgan made a bad judgment in 2008 when she determined that Redmond's conduct was not a Zero Tolerance violation, the court's role is not to second-guess the fairness of Morgan's business judgments when nothing ties the judgment to discrimination.

As to the second and third arguments, Martin mischaracterizes the evidence; a careful reading of the evidence does not support the existence of shifting and inconsistencies in the timing of the discipline determination or in the offense for which Martin was disciplined. Rather, Morgan's testimony consistently set February of 2011 as the month she concluded that Martin had violated a Zero Tolerance Rule, followed by a period during which she attempted to staff Martin's shift before terminating him.  The date she created the paperwork for counseling and termination does not necessarily have to be the date that she determined Martin had committed the terminable offense, and the only shifting the evidence reflects was Morgan's *shifting* people to the night *shift* to ensure it was fully staffed.  Further,  Martin's own testimony reflects that at the time he was advised he was being suspended, the reason given was not limited to sleeping in his car but also included "extended lunch and breaks," consistent with the reasons given on his Coaching and Counseling Form: "exceeding the authorized length of break periods, leaving the plant during work hours without permission, and excessive unauthorized absence from the workstation during the workday."  (Docs. 33-2, at 31 p. 121 & at 33, p. 129; 33-4, at 60).

For these reasons, Martin has not met his burden of establishing pretext on the disparate treatment claims brought pursuant to Title VII and § 1981.

**B.  Retaliation based on Race**

Although Gestamp's brief addressed the retaliation claim, Martin's response does not address that claim, but focuses entirely upon the claim of disparate treatment based on race. Accordingly, the court finds that Martin has abandoned the retaliation claim based on race. *See, e.g., Coal. for the Abolition of Marijuana Prohibition v. City of Atlanta*, 219 F.3d 1301, 1326 (11th Cir. 2000) ("failure to brief and argue this issue during the proceedings before the district court is grounds for finding that the issue has been abandoned"); *Lyes v. City of Riviera Beach, Fla.*, 126 F.3d 13808, 1388 (11th Cir. 1997) (noting that "'the onus is upon the parties to formulate arguments; grounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned'"), *reh'g granted and vacated by,* 136 F.3d 1294 (1998), *reinstated by* 166 F.3d 1332, 1336 (11th Cir. 1999) (*en banc).*  That claim, the third cause of action stated in the Amended Complaint, is due to be DISMISSED WITH PREJUDICE.

## V.  CONCLUSION

For the reasons discussed above, the claim for retaliation based on race is due to be DISMISSED WITH PREJUDICE because it was abandoned, and Gestamp's motion for summary judgment is due to be GRANTED as to the only remaining claim, the claim for disparate treatment based on race.

Dated this 3rd day of June, 2014.

*Karon O. Bowdre*

KARON OWEN BOWDRE
CHIEF UNITED STATES DISTRICT JUDGE